# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SANDRA RENEE URIOSTE,

      Plaintiff,

v.                                         CV 11-867 WPL

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## MEMORANDUM OPINION AND ORDER

Sandra Renee Urioste filed applications for Disability Insurance Benefits and Supplemental Security Income on August 9, 2007. (Administrative Record ("AR") 10, 100.) She alleges disability beginning May 5, 2007, due to osteoarthritis ("OA") in both knees, swelling in her legs, and depression. (AR 35-34, 100, 103, 104.) Administrative Law Judge ("ALJ") W. Thomas Bundy held a disability hearing on July 24, 2009. (AR 20-37.) On September 8, 2009, he determined that Urioste was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 10-19.) Urioste filed an appeal with the Appeals Council, but the Council declined her request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 239-41.)

Urioste sought review of the SSA's decision on September 28, 2011 (Doc. 1), and filed a Motion to Remand to Agency for Rehearing on March 5, 2012 (Doc. 19). The Commissioner responded in opposition (Doc. 20), and Urioste filed a reply (Doc. 21). Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties consented to have me serve as the presiding judge and enter a final judgment. Having carefully considered the pleadings, facts, and

relevant law, I grant Urioste's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). A "decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* (quotation omitted). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See id.* The ALJ's "failure to apply the correct legal standards, or to show us that she has done so, [is] also grounds for reversal." *Winfry v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996) (citing *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first three steps, the ALJ considers the claimant's current work activity and the medical severity of the claimant's impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Before reaching step four, the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ compares the claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from

performing his past work, then he is not disabled. *Id.* If the claimant cannot return to his past work, then the Commissioner must show at the fifth step that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25. *See also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

## FACTUAL BACKGROUND

Urioste is a fifty-one year-old woman with a high school education. (AR 108.) She worked as a demonstration coordinator for sixteen years at a grocery store, and she left her job in May 2007 because of painful swelling in her legs and feet and OA in her knees.[1] (AR 26, 104-05.)

The earliest medical records available documenting Urioste's treatment are from August 15, 2007, a week after she filed for benefits.[2] (AR 157.) Urioste saw Caroline Kingston, M.D., for her knee problems, and, upon performing a review of all of her major systems, Dr. Kingston found that she was positive for muscle pains, stiff joints, and joint pain. (AR 157-58.) She diagnosed Urioste with OA, morbid obesity, and edema and referred her for x-rays of both knees. (AR 158-59.) The x-rays were taken on November 16, 2007, and they revealed moderately severe medial joint space OA and mild to moderate lateral joint spaces OA in her left knee and mild OA of the medial and

---

[1] During the hearing, the ALJ asked Urioste if she left her job, and she stated "they were shoving me out the door little by little . . . . They cut my hours, and then they cleaned out my desk, and then they took my phone away." (AR 26-27.) I interpret this statement to mean she quit and was not fired.

[2] In a Physical RFC Assessment, a consultative physician noted that Urioste had seen a family doctor on June 15, 2007, but the actual treatment notes are not in the record. (AR 169.)

lateral compartments and patellofemoral joint and a possible intraarticular body in the right knee. (AR 167.)

On October 9, 2007, John R. Vigil, M.D., performed a consultative disability exam of Urioste. (AR 161-165.) Urioste reported that her pain was a ten out of ten but that she could walk for thirty to forty minutes and had no problems with activities of daily living such as dressing, feeding, or bathing herself. (AR 162.) Dr. Vigil performed a review of systems and found that she was negative for any psychological issues, alert and cooperative, oriented to person, place, time, and situation, and had a normal affect. (AR 163-64.) He also noted trace edema at her ankles and that she had a slow, antalgic gait and a limp. (AR 164.) Both her knees were tender and she had subpatellar crepitus[3] in her left knee. (*Id.*) His final assessment was that she suffered from chronic bilateral lower extremity pain and moderate OA and that her morbid obesity contributed to these conditions. (AR 165.) Based on these findings, he opined that Urioste had a mild to moderate functional disability with regard to lifting, carrying, walking, and standing. (*Id.*) He did not believe that she had a functional disability with regard to sitting, handling objects, speaking, traveling, or engaging in fine manipulation with her hands and fingers. (*Id.*)

Margaret Vining, M.D., performed a physical RFC assessment of Urioste on November 25, 2007. (AR 168-175.) She diagnosed Urioste with moderately severe degenerative joint disease ("DJD")[4] in the left knee and mild DJD in the right, which was made "functionally more limiting by morbid obesity." (AR 170.) Dr. Vining opined that Urioste was capable of frequently and

---

[3] The grating of a joint, often associated with OA. STEDMAN'S MEDICAL DICTIONARY 424 (27th ed. 2000).

[4] DJD is another term for OA. *See* LEE RUSS, BRUCE FREEMAN & J. STANLEY MCQUADE, 7 ATTORNEYS MEDICAL ADVISOR § 68.12 (2012).

occasionally lifting ten pounds, standing or walking for at least two hours in an eight hour work day with normal breaks, and sitting for six hours in an eight hour work day with normal breaks. (AR 169.) She also stated that Urioste's ability to push and/or pull was limited in her lower extremities. (*Id*.) Her findings were based on an examination of her spine, knees, medical records, and the November 2007 x-rays. (*Id*.) With respect to postural limitations, Dr. Vining believed that Urioste could frequently balance, occasionally climb stairs, stoop, and crouch, and never climb ladders, scaffolds, or ropes, kneel, or crawl. (AR 170.) Dr. Vining found Urioste had no manipulative, visual, or communicative limitations. (AR 171-72.) However, she believed that Urioste should avoid concentrated exposure to extreme cold, wetness, humidity, and hazards. (AR 172.)

Elizabeth Chiang, M.D., performed a psychiatric review of Urioste on January 15, 2008. Urioste had claimed depression as an additional impairment and stated that she was taking prescription medication for her depression. (AR 188.) However, Urioste had not received treatment for depression after the initial determination. (*Id*.) Her review of systems was negative for psychiatric issues, she had a normal affect, and was oriented to all four spheres, so Dr. Chiang found that she was negative for depression or any other psychiatric issues. (*Id*.)

On August 7, 2008, Urioste went to Keri Black, C.N.P., for treatment. (AR 211-12.) At her initial visit, Urioste reported that she was only taking albuterol and ibuprofen. (AR 211.) Nurse Black noted that Urioste had lower extremity edema, obesity, and depression and that Urioste was seeking disability benefits. (AR 211-212.) She referred Urioste for physical therapy and an x-ray of her left knee, but the x-ray is not included in the record. (AR 212; *see also* AR 204, 207 (referencing x-rays from 2008).) While Nurse Black's treatment notes do not document a prescription for anti-depressants, Urioste stated that Nurse Black prescribed her setraline for anxiety attacks and depression on August 7, 2008, on an undated SSA form. (AR 148.)

On August 12, 2008, Urioste began physical therapy with Nancy McKinnon, P.T. (AR 229-30, 236-37.) McKinnon planned on treating Urioste twice a week for four weeks (AR 231), but she discharged Urioste after three weeks due to pain and lack of improvement (AR 232). McKinnon encouraged Urioste to start water-based exercises. (*Id*.)

In November 2008, Nurse Black met with Urioste and wrote her a note which read, "Sandra Urioste is followed frequently for debilitating osteoarthritis which is interfering with her activities of daily living. This currently precludes gainful employment." (AR 197, 209.) At the time of the letter, the records indicate that Black had seen Urioste only once.

In January 2009, Mark Cohen, M.D., conducted a clinical consultation for Nurse Black. Urioste reported that she was taking pain medications and anti-depressants. (AR 206.) She also told Dr. Cohen that her pain was a ten out of ten but with the medication it was a five out of ten. (*Id*.)

Nurse Black next saw Urioste on May 26, 2009. (AR 204.) Nurse Black noted that Urioste had begun using a cane and that there was swelling of her peripheral joints. (*Id*.) Urioste was still taking anti-depressants. (*Id*.) Despite Nurse Black's recommendations, Urioste declined to use corticosteroid injections. (AR 205.) Nurse Black referred Urioste to see an orthopedic physician, but there is no indication that she saw one. (*Id*.)

Nurse Black saw Urioste again one month later. (AR 201-02.) Urioste reported right knee pain and swelling after light ambulation. (AR 201.) At the time of the appointment, Urioste had stopped taking her anti-depressant medication because it made her sick, but Black prescribed more anti-depressants and instructed her to continue to take them. (AR 202.)

### HEARING TESTIMONY

The ALJ held a hearing on July 24, 2009, at which Urioste and Thomas Granner, a vocational expert ("VE"), testified. (AR 20.) Urioste was unrepresented at the hearing. (AR 23.)

Urioste brought additional records and information to the hearing, including records from her physical therapist, x-rays, a report from her healthcare center in Albuquerque, and printouts from the internet, the last of which the ALJ did not accept. (AR 24-25.)

Urioste testified that, from 1991 to 2007, she worked in a grocery store, but she left because her legs and feet would swell and cause difficulty walking. (AR 26.) She stated that the problem with her job was that she was constantly on her feet. (AR 27.)

The ALJ next asked the VE questions about a hypothetical individual with Urioste's limitations. (AR 28.) The VE testified that an individual with a capacity for sedentary work who could only occasionally climb ramps or stairs, crouch, and stoop, never climb ladders or scaffolds, kneel, or crawl, and must avoid concentrated exposure to extremes of cold, wetness or humidity, and a hazardous work environment would not be able to perform Urioste's past relevant work. (*Id.*) The VE testified that a person with such limitations could work as a telephone solicitor or call out operator. (*Id.*) According to the VE, there are 300,000 telephone solicitor jobs available in the national economy and 200,000 jobs available in New Mexico. (*Id.*) For a call out operator, there are 65,000 jobs in the national economy and 170 jobs available in New Mexico. (*Id.*)

After questioning the VE, the ALJ returned to Urioste. He asked her if she thought she could manage a job during which she sat for most of the day if she had normal breaks. (AR 29.) She indicated that she would not be able to work in such a position because "every time" she sits down, her legs and feet start "blowing up." (*Id.*) She claimed that she needed to lie down and elevate her feet regularly. (*Id.*) She also claimed that her shoes no longer fit because of the swelling. (AR 31.) The ALJ asked Urioste if she was taking prescription medication, and she informed him that she took medications for depression, anxiety, sleeping, arthritis, and menopause. (AR 31-32.) Urioste arrived at the hearing with a cane, and she informed the ALJ that she asked her physical therapist

if she could use one, and the therapist stated that if it helped, she could. (AR 32-33.) She told the ALJ that she can stand and walk for up to thirty minutes but then needs to sit down for another fifteen minutes. (AR at 34.)

The ALJ asked Urioste if she was trying to lose weight, but she said she had not considered weight loss because of her depression. (AR 35.) The ALJ asked her what she meant by "depression," and Urioste told him that she cried in her room every day. (AR 35-36.)

### THE ALJ DECISION

The ALJ reviewed Urioste's application for benefits according to the sequential evaluation process. At the first step, the ALJ found that Urioste had not engaged in substantial gainful activity since her alleged onset date of May 5, 2007. (AR 12.) Then, at the second step, the ALJ concluded that she suffers from the severe impairments of chronic bilateral lower extremity pain, moderate OA of the knees, and morbid obesity. (*Id*.) The ALJ expressly considered Urioste's alleged depression and concluded that she had no medically determinable mental impairment and that her allegations would have no impact on her ability to do semi-skilled work with a specific vocational preparation of three. (AR 12-13.) The ALJ based his decision on her testimony at the hearing, her Adult Function Report from September 2007, and the opinions of Drs. Kingston, Vigil, and Chiang. (*Id*.)

At step three, the ALJ found that Urioste's combination of severe impairments did not equal one of the listed impairments. (AR 13.) The ALJ then reviewed the medical evidence and determined that Urioste had an RFC for sedentary work and could perform the following functions: frequently lift or carry ten pounds; stand or walk, with normal breaks, for at least two hours in an eight hour work day; sit, with normal breaks, for six hours in an eight hour workday; occasionally push or pull with her lower extremities; occasionally climb ramps or stairs, stoop, or crouch; never climb ladders, ropes, or scaffolds, kneel, or crawl. (*Id*.) He also found that she should avoid exposure

8

to extreme cold, wetness, humidity, and hazards. (*Id*.) The ALJ based his determination on the opinions of Drs. Vining, Kingston, and Vigil, the x-ray evidence, and Urioste's statements regarding her daily activities. (AR 14-16.) The ALJ considered Nurse Black's opinion but did not believe her opinion was consistent with the medical evidence or with Urioste's own reported activity level. (AR 16.) He also noted that "[t]he record revealed but very little medical treatment for the claimant's alleged disabling symptoms." (AR 17.)

At step five, the ALJ concluded that Urioste could not perform her past relevant work. (*Id*.) He determined that the transferability of job skills was not material to a disability determination, so he did not make findings as to whether Urioste's skills were transferable. (*Id*.) He then considered her age, education, work experience, and RFC for sedentary work and concluded that, based on the testimony of the VE, she could perform the work of a telephone solicitor or a call out operator. (AR 18.)

DISCUSSION

Urioste challenges the ALJ's decision on six grounds: (1) failure to develop the record regarding her depression and anxiety; (2) failure to comply with standard protocol during the hearing; (3) the RFC determination is not based on substantial evidence; (4) the credibility determination is not based on substantial evidence; (5) failure to find that Urioste's skills were transferable; and (6) the number of call out operator jobs is legally insufficient. While I disagree with Urioste's first four arguments, her last two arguments have merit and, together, warrant remand.

## I.    Development of the Record

Urioste disagrees with the ALJ's conclusion that she did not have a determinable mental

impairment of depression.[5] (Doc. 19 at 9.) She asserts that the ALJ should have ordered a consultative examination, and his failure to do so amounts to reversible error. (*Id*.)

It is well settled that the burden to prove disability in a social security case is on the claimant. *See Hill v. Sullivan*, 924 F.2d 972, 974 (10th Cir. 1991). Nonetheless, since a social security disability hearing is non-adversarial, the ALJ must "ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *see also Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987). The burden on the ALJ is greater when the claimant is unrepresented at the hearing. *Henrie*, 13 F.3d at 361.

An issue need not be included in the claimant's application for benefits in order for it to be considered "raised" before the ALJ; the duty to develop the record extends to impairments that the ALJ becomes aware of during the administrative hearing. *Carter v. Chater*, 73 F.3d 1019, 1021-22 (10th Cir. 1999). Urioste noted a history of prescriptions for anti-depressants and testified at the hearing that she suffered from depression. (AR 35-36, 148). This properly raised the mental impairment of depression before the ALJ. *Id.*; *Hawkins v. Chater*, 113 F.3d 1162, 1164 n.2 (10th Cir. 1997).

Once an issue is before the ALJ, he will consider whether it constitutes a medically determinable impairment, and, if so, whether that impairment is "severe" or "non severe." *See* 20 C.F.R. §§ 404.1520(c), 419.920(c). A medical impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of

---

[5] Urioste incorrectly states that the ALJ found that her depression was "a non-severe impairment with no functional limitations." (Doc. 19 at 10.) This is incorrect. The ALJ found that she "had no medically determinable mental impairment." (AR 13.)

symptoms." 20 C.F.R. §§ 404.1508, 416.908.

When the ALJ does not have sufficient information from the claimant's medical sources to determine whether an impairment exists, he may order a consultative examination. *See* 20 C.F.R. §§ 404.1519a, 416.919a. The ALJ has broad latitude in determining whether to order consultative examinations, but he must order one when the medical evidence is in direct conflict or the record is inconclusive. *Id.*; *Thompson v. Sullivan,* 987 F.2d 1482, 1491 (10th Cir. 1993); *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 778 (10th Cir. 1990). However, if the record contains sufficient evidence on which the ALJ may base a decision regarding an impairment, the ALJ does not need to order a consultative evaluation. *Hawkins*, 113 F.3d at 1164-65.

In *Hawkins*, the Tenth Circuit affirmed an ALJ's decision not to order a psychological examination of a claimant who alleged disabling depression, finding that there was sufficient evidence in the record to support the ALJ's conclusion that the claimant did not have a mental impairment. *Id.* at 1165. The record contained notes from two treating physicians who had prescribed her anti-depressants, testimony at the hearing from Hawkins and her sister that she was depressed, and a note from an agency interviewer that she "looked" depressed. *Id.* at 1164-65. The record also contained a psychiatric review technique form from a consultative psychiatrist who found that Hawkins did not suffer from a medically determinable impairment. *Id.* at 1165. Even though the ALJ did not mention the psychiatrist's findings, the Tenth Circuit found that those findings, "coupled with the absence of any objective medical findings regarding claimant's alleged depression" amounted to substantial evidence in the record to support the ALJ's determination that the claimant did not have a mental impairment.

The facts of *Hawkins* are similar to the present matter. The record shows that Nurse Black prescribed Urioste anti-depressant medication, and Urioste testified at the hearing that she felt

11

depressed and often cried. The ALJ considered these facts alongside Urioste's report that she could perform daily tasks, leave the house, attend family gatherings, and follow written and spoken instructions. (AR 12-13.) Additionally, he noted that Urioste did not report any depression, anxiety, difficulty concentrating, or suicidal thoughts to Dr. Kingston, and Dr. Vigil found her alert, that her affect was normal, and that she was oriented to person, place, time, and situation. (AR 13.) He expressly considered the psychiatric review technique form completed by Dr. Chiang, which found that she had no mentally determinable impairment. (AR 13, 176.)

Urioste attacks the ALJ's reference to Dr. Kingston, claiming that "it was improper for the ALJ to attach significance to a medical doctor's failure to note a medical problem." (Doc. 19 at 10.) In support of her argument, she cites two district court opinions. (*Id*. (citing *Tucker v. Sullivan*, 779 F. Supp. 1290, 1298 (D. Kan. 1991); *Caldwell v. Sullivan*, 736 F. Supp. 1076, 1082 (D. Kan. 1990)).) In both cases, the courts found that the absence of any notation in a treatment record of a psychological problem could not support a finding that a claimant did not have a mental impairment. *Tucker*, 779 F. Supp. at 1298; *Caldwell*, 736 F. Supp. at 1082. Conversely, Dr. Kingston reviewed all of Urioste's major systems, and under "Psychiatric" she wrote that Urioste was "Negative For: hallucinations; obsessive compulsive behaviors; suicidal thoughts or attempts; excessive worries or preoccupations; . . . difficulty concentrating; . . . depression; anxiety . . . ." (AR 158.) Affirmatively noting that a patient is negative for a mental impairment is distinctly different than failing to mention a mental impairment at all. Here, Dr. Kingston did consider Urioste's mental state and made an inquiry, albeit brief, into these matters. While it is clear that the nature of the examination was for Urioste's knee pain, it is not immaterial that Dr. Kingston noted that Urioste was negative for depression. It is also not improper for the ALJ to consider these findings.

Moreover, the ALJ considered Dr. Kingston's observation in conjunction with the above

mentioned medical evidence. Thus, the ALJ's decision that Urioste had no mental impairment was properly supported by substantial evidence and is not a basis for remand.

## II.    Violation of Hearing Protocol

Urioste argues that the ALJ did not discuss the exhibits in the claim file with her, and this is a violation of protocol. (Doc. 19 at 11.) This argument is a non-starter, which even Urioste admits. (Doc. 19 at 12.) Since hearing protocol does not have the force of law (*id.*), I will not entertain this argument.

## III.    RFC Determination

The ALJ's RFC determination contains a function by function assessment of Urioste's limitations. Urioste claims that the ALJ's findings regarding her ability to carry and lift and walk or stand are not supported by substantial evidence. (Doc. 19 at 13.) Because I find both determinations are supported by substantial evidence, I affirm the ALJ's RFC determination.

The RFC is a measure of the maximum that a claimant can do physically and mentally on a regular and continuing basis. *See* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The ALJ is responsible for making an RFC determination based on evidence of exertional and non-exertional impairments. *See* 20 C.F.R. §§ 404.1545(a)(4) ("[W]e will consider your ability to meet the physical, mental, sensory, and other requirements of work"), 416.945(a)(4) (same). To formulate the RFC, the ALJ assesses the claimant's restrictions on a function-by-function basis. SSR 96-8p, at *1, *3.

The ALJ found that Urioste can occasionally and frequently lift or carry up to ten pounds (AR 13), but she claims that this is contrary to the evidence in the record. Urioste points to Dr.

Cohen's treatment notes, which found that she had a mildly positive Phalen's sign,[6] as well as the fact that she uses a cane, which would make carrying difficult. (Doc. 19 at 13.) However, there is ample evidence in the record to support the ALJ's RFC determination. Dr. Vining opined that Urioste was capable of such carrying (AR 169), and the ALJ expressly adopted her opinion as his own (AR 16). Dr. Vining's opinion is supported by Dr. Vigil's exam, which found that Urioste had mild to moderate limitations in carrying and "no functional deficits in handling of objects . . . or fine manipulation with hands and fingers." (AR 165.) I do not believe the results from one test and the use of a cane overwhelm the evidence that supports the ALJ's RFC determination, and so the ALJ's decision must stand. *See Hamlin*, 365 F.3d at 1214.

Urioste next challenges the ALJ's conclusion that she could stand for at least two hours in an eight hour period with breaks. (Doc. 19 at 13.) She begins by arguing that the ALJ failed to explain how Dr. Vigil's finding that she had a "mild[7] to moderate impairment" in the ability to stand and walk translated into a finding that she could stand or walk for two hours at a time. (Doc. 19 at 13-14.) Urioste mischaracterizes the ALJ's findings in a significant way. The ALJ did not find that she could walk or stand for two hours at a time; he found she could walk or stand a total of two hours in an eight hour day with normal breaks. (AR 13.) There is nothing inconsistent in finding that someone with a mild to moderate impairment in walking may only walk or stand for two hours total during a work day. In fact, the ALJ based his finding on Dr. Vining's opinion, which expressly

---

[6] Phalen's Test is wrist flexion test used to diagnose carpal tunnel syndrome. DAN J. TENNENHOUSE, ATTORNEY'S MEDICAL DESKBOOK § 18:4 (4th ed. 2011); 7 ATTORNEY MEDICAL ADVISOR § 67.15 (2012). Dr. Cohen did not diagnose Urioste with carpal tunnel syndrome or any other condition relating to her hands or wrists. (AR 206-08.)

[7] Urioste incorrectly states that Dr. Vigil found that she had a "moderate impairment" (Doc. 19 at 13), but Dr. Vigil actually found that she had a "mild to moderate impairment." (AR 165.) Either way, a moderate impairment is not a severe one, and would not preclude walking and standing altogether.

found that Urioste could stand and/or walk for such a period of time. (AR 169.) Furthermore, Urioste told Dr. Vigil that she could walk for thirty to forty minutes (AR 162); she told her physical therapist, McKinnon, that she could walk for thirty-five to forty-five minutes and stand for twenty-five minutes (AR 229). Her own statements support the ALJ's finding. She admittedly is capable of standing and walking so long as she is provided breaks; thus, the ALJ's determination is not improper.

Next, Urioste claims that the ALJ did not properly consider her morbid obesity when assessing her ability to ambulate. (Doc. 19 at 14.) Here, Urioste confuses the various steps in the sequential evaluation process. She first quotes the ALJ's findings from step three, in which the ALJ found that she did not have an impairment or a combination of impairments which was equivalent to one of the listed impairments in the medical grids. (AR 13.) In making that determination, the ALJ considered Urioste's severe impairment of obesity by itself and in combination with other impairments but found that it did not, alone, prevent her from ambulating "effectively," and it did not increase the severity of her OA to the extent that it met any of the criteria in the Listing Section. (AR 13.)

Urioste argues that, based on his step three findings, the ALJ did not properly consider that her ability to ambulate is affected by her obesity when making his RFC determination. However, the ALJ based his RFC determination regarding her ability to walk on the opinions of Drs. Kingston, Vining, and Vigil. (AR 14-16.) All three doctors considered Urioste's obesity in formulating their opinions. (AR 158, 163, 165, 170.) In fact, the ALJ ultimately adopted the RFC assessment of Dr. Vining, and Dr. Vining had noted that her knee pain was made "functionally more limiting by morbid obesity." (AR 170.) Thus, her obesity was properly considered and factored into the ultimate formulation of her RFC.

Contrary to Urioste's assertions, the ALJ's RFC determination as to her ability to stand and walk is also proper in light of the treating physician rule. Urioste insists that the ALJ failed to properly assess Nurse Black's opinion under the treating physician rule and that this is grounds for remand. (Doc. 19 at 16.) However, I need not address whether Nurse Black qualifies as a treating physician or whether the ALJ sufficiently discussed the degree of weight he afforded her opinion in order to resolve this issue. This is because there is no inconsistency between Nurse Black's medical opinion and the ALJ's findings as to Urioste's ability to stand or walk.

A treating physician's opinion is not entitled to controlling weight or deference unless it qualifies as a "medical opinion." *See* 20 C.F.R. §§ 404.1527(a) & (d), 416.927(a) & (d). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An opinion on an issue reserved to the Commissioner, such as an opinion that the claimant is disabled, does not qualify as a "medical opinion" even if given by a treating physician. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e); *see also Balthrop v. Barnhart*, 116 F. App'x 929, 932 (10th Cir. 2004) (unpublished) (holding that opinion that claimant was "totally disabled and unable to be gainfully employed" was not a "medical opinion.").

Assuming, *arguendo*, that Nurse Black is a treating physician, she never opined as to the length of time that Urioste may walk or stand in an eight hour day. In fact, she did not give any opinion on Urioste's ability to walk or stand.[8] The only opinion provided by Nurse Black states,

---

[8] Nurse Black made observations about Urioste's gait and movement, and she included Urioste's statements in her treatment notes. (AR 201 ("[P]atient is complaining of right knee pain with swelling with

16

"Sandra Urioste is followed frequently for debilitating osteoarthritis which is interfering with her activities of daily living. This currently precludes gainful employment." (AR 197.) The statement that her condition precludes gainful employment is not a medical opinion, and the ALJ need not consider it. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e); *Balthrop*, 116 F. App'x at 932. This leaves Nurse Black's diagnosis of OA as the sole medical opinion, which the ALJ did adopt when he found that OA was a "severe impairment." (AR 12.) Further, the ALJ did believe that Urioste was restricted enough in her activities of everyday living such that she may only perform sedentary work. (AR 13.) Since there is no apparent inconsistency between Nurse Black's opinion and the ALJ's RFC determination, there can be no violation of the treating physician rule.

## IV.   Credibility

Judging credibility is "peculiarly the province" of the ALJ. *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). Nevertheless, a credibility determination must be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of a finding. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).

The ALJ found that Urioste's allegations regarding the intensity, persistence, and limiting effects of her OA and obesity were not credible to the extent that they were inconsistent with the RFC. (AR 14.) Urioste believes that this credibility determination amounts to mere "boilerplate" language and that it is not supported by the evidence in the record. (Doc. 19 at 19.) Had Urioste paid closer attention to the ALJ's opinion, she would realize that he spent three pages discussing her testimony as to her limitations, the medical evidence in the record, and the inconsistencies that led

---

even light ambulation."), 204 ("[S]he uses a cane."), 211 ("Bilateral feet/leg swelling . . . worse as the day progresses.").) However, she did not make any conclusions about her ability to stand or walk based on these observations.

him to believe Urioste was not entirely credible. (AR 14-16.)

The ALJ began with Urioste's testimony regarding her own limitations, including that she was obese, she used a cane, her legs would swell every time she sat down, she had a handicapped placard, and she could not walk for more than twenty minutes without a ten to fifteen minute break. (AR 14.) He then went through the medical records, listing the findings of Dr. Kingston, Dr. Vigil, Nurse Black, and Dr. Vining, as well as the statements Urioste made in her Adult Function Report. (AR 14-15.) He discussed medical reports that found she had no limitations as to sitting (AR 14), she could walk for more than thirty minutes (AR 14-16), and she could perform basic household chores (AR 16).

The ALJ then proceeded to analyze the inconsistencies between the record and Urioste's assertions. (*Id.*) He found that "the claimant has described daily activities which are not limited to the extend [sic] one would expect, given the complaints of disabling symptoms and limitations." (*Id.*) He also noted that she made inconsistent statements to Dr. Vigil and Nurse Black about her ability to do household chores and that her function report indicated that she was able to perform basic activities and did not experience pain when sitting. (*Id.*) I believe this extensive analysis of the medical evidence, coupled with a comparison to Urioste's statements, provides more than substantial evidence for the ALJ's credibility determination.

## V.    Transferability of Job Skills

Typically, "[w]hen the issue of skills and their transferability must be decided, the . . . ALJ is required to make certain findings of fact and include them in the written decision." SSR 82-41, at *7, 1982 WL 31389, at *7 (1982). The ALJ first addressed the issue of transferability at step five. After making findings regarding Urioste's age, education, and ability to communicate in English, the ALJ stated that "transferability of job skills is not material to the determination of disability

because using the Medical-Vocational Rules as a framework supports a finding that the claimant is not disabled, whether or not the claimant has transferable skills." (AR 17.) However, the ALJ went on to conclude that use of the Medical-Vocational Rules was not appropriate here because Urioste had non-exertional limitations. (*Id.*); 20 C.F.R. Pt. 404, Subpt. P app. 2 § 200.00 (e)(2). His decision not to determine the transferability of skills was in error.[9] Since, by his own admission, he chose not to make a finding that her skills from her previous semi-skilled job were transferable, he cannot, at step five, conclude that she can perform sedentary, semi-skilled work, such as that of a telephone solicitor.

## VI.   Significant Number of Jobs

The ALJ adopted the VE's findings that Urioste could perform the semi-skilled job of a telephone solicitor or the unskilled job of a call out operator. (AR 18, 28.) Since the ALJ did not find that Urioste may perform semi-skilled work, this leaves the call out operator job as the only job on the record that Urioste may perform. The VE testified that there are only 170 call out operator jobs in New Mexico and 65,000 jobs nationally. (AR 28.) Urioste argues that the regional and national numbers are so low that they cannot support a finding that there is a legally sufficient number of jobs available in the economy. (Doc. 19 at 18.) I agree.

At step five, the burden of proof shifts to the Commissioner to show that the claimant retains the RFC to do work which exists in significant numbers in the national economy. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993); 20 C.F.R. §§ 404.1566, 416.966. The determination that work exists in significant numbers in the national or local economy does not depend on whether the work exists in the area in which the claimant lives, whether a specific job vacancy exists, or

---

[9] Notably, the Commissioner did not argue in his response brief that the ALJ properly found that Urioste's skills were transferable. (Doc. 20 at 15-16.)

whether the claimant would be hired for the job if he applied. *See* 20 C.F.R. § 404.1566(a), 416.966(a).

The Tenth Circuit "has never drawn a bright line establishing the number of jobs necessary to constitute a 'significant number' . . . ." *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992). Rather, there are "several factors [that] go into the proper evaluation of significant numbers," which include: "the level of claimant's disability; the reliability of the vocational expert's testimony; the distance claimant is capable of traveling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on." *Id.* (quoting *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988)). While there is no specific number that triggers the ALJ's duty to evaluate whether jobs are present in "significant numbers," this circuit has found that a range of 850 to 1,000 potential jobs within the claimant's state requires the ALJ's consideration. *Id.* at 1330 n.10. There are only 170 available call out operator jobs in the state of New Mexico; surely this requires that the ALJ discuss the *Trimar* factors. However, the ALJ summarily concluded that work exists in significant numbers, likely because there were clearly a significant number of positions as a telephone solicitor. (AR 18.) He did not question the VE about the relevant factors nor did he discuss any of these factors in his opinion. The absence of any inquiry into the legal sufficiency of such a low number of jobs warrants remand.

### CONCLUSION

The ALJ properly determined the nature of Urioste's impairments, her RFC, and her credibility. However, at step five he failed to discuss the transferability of her skills and consider whether there are a significant number of call out operator jobs in New Mexico. Accordingly, I grant Urioste's motion to reverse, and I remand this case back to the SSA for proceedings consistent with this opinion.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge

A true copy of this notice was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.